2023 IL App (1st) 220126-U

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

SIXTH DIVISION
February 3, 2023

No. 1-22-0126

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Cook County. |
| v. | ) ) | No. 20 CR 1049 |
| ROBERT JONES, | ) ) | Honorable Vincent M. Gaughan, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE MIKVA delivered the judgment of the court.
Justices C.A. Walker and Tailor concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's convictions for aggravated criminal sexual assault and aggravated battery are affirmed where the admission of evidence of a prior sexual assault by defendant was not erroneous. Trial counsel was not ineffective for withdrawing a limiting jury instruction on other-crimes evidence as a matter of trial strategy.

¶ 2    Following a jury trial, defendant Robert Jones was convicted of two counts of aggravated criminal sexual assault and one count of aggravated battery and sentenced to a total of 20 years in prison. On appeal, he contends that the trial court erred in admitting evidence of a prior sexual offense because it bore only minimal similarity to the charged offenses and was more prejudicial than probative. He also contends that trial counsel was ineffective for withdrawing a limiting jury

instruction on other-crimes evidence. For the reasons stated below, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      Mr. Jones was charged with 18 offenses allegedly committed on or about December 16, 2019. The State proceeded to trial on four counts: two counts of aggravated criminal sexual assault (720 ILCS 5/11-1.30(a)(2) (West 2018)) and one count each of attempted first degree murder (*id.* §§ 8-4(a), 9-1(a)(1)) and aggravated battery (*id.* § 12-3.05(a)(5)).

¶ 5      Prior to trial, the State filed a motion to admit proof of other crimes. The record does not include a copy of the motion. However, the trial court filed a lengthy order granting the motion that described the motion in some detail. The court order said the motion was governed by section 115-7.3 of the Code of Criminal Procedure (Code) (725 ILCS 5/115-7.3 (West 2018)) allowing evidence of other sex offenses to show propensity in sex-offense cases. The court also noted that the State argued the evidence was "relevant to show intent, motive, absence of mistake and propensity to sexual assault."

¶ 6      According to the trial court's order, the State argued that the evidence at trial in the current case would be that the victim, who we will refer to as T.E., and Mr. Jones began dating after meeting online. On the night of the incident, Mr. Jones picked up T.E. and went to a motel where he rented a room under his name using his credit card. Mr. Jones and T.E. sat in the motel room and talked, then he left while she took a nap. After returning, Mr. Jones made sexual advances towards T.E., which she rejected. After she told him that she did not want to have sex, he left again and she lay down in bed.

¶ 7      Mr. Jones returned, angry with T.E. for not having sex with him. When she got out of bed to leave, Mr. Jones grabbed her and tried to remove her pants. They struggled and he began strangling her. He pushed her down to the bed and was on top of her as he continued strangling

her and she continued to struggle until she lost consciousness. When she awoke, he was having forced vaginal sex with her, not using a condom. She bled onto the bedding. Mr. Jones drove her home, where she made an immediate outcry to her mother.

¶ 8 The trial court summarized the earlier incident that the State wanted to admit evidence of, as described in the State's motion. In November 2011, Mr. Jones sexually assaulted C.H. while both were in the Air Force, for which he was convicted in court-martial, dishonorably discharged, and sentenced to three years in prison. On the night of the incident, C.H. and a friend went to a nightclub, where C.H. met Mr. Jones and some of his friends. When the club closed at 3 a.m., a group of people including C.H., Mr. Jones, and Tijon North went to a hotel to continue partying. In the taxi to the hotel, Mr. Jones groped C.H. despite her repeated requests to stop. The party wound down after 5 a.m., and the people remaining in the room began going to sleep.

¶ 9 As C.H. lay in bed, Mr. Jones began pulling up her dress. She went to a different bed, but a short time later returned to Mr. Jones's bed, believing he was asleep. After a few minutes, Mr. North got into bed with C.H. and Mr. Jones. Mr. Jones tried to pull up C.H.'s dress and feel her legs and breasts despite her telling him to stop. Mr. Jones tried to kiss and mount C.H., who again said no. Mr. North grabbed her by her shoulders and held her down while Mr. Jones was on top of her removing her clothes. She said no again and attempted to push Mr. Jones off. He inserted his penis into her vagina as Mr. North held her down by the shoulders. Mr. Jones ejaculated without a condom.

¶ 10 The defense responded to the State's motion, arguing that the evidence would be more prejudicial than probative because the prior incident was too dissimilar. The defense argued that the earlier incident involved a third party holding down the victim and forcing her to have sex with Mr. Jones, while the allegations in the current case were that Mr. Jones alone beat and strangled

T.E. Secondly, while the earlier "incident was *** in a party setting with alcohol and several other people involved and nearby, the present case concerns two people who had consensually agreed to meet each other alone in a private hotel room." Lastly, the victim in the earlier incident was conscious throughout while T.E. claimed Mr. Jones rendered her unconscious before the assault.

¶ 11    At the motion hearing, the State told the court that DNA testing in this case was a match to Mr. Jones. Defense counsel argued, in addition to the arguments in the motion response, that the other-crimes evidence would not be needed to show identity because of the DNA evidence and because Mr. Jones would not deny having sex with T.E. but would argue consent.

¶ 12    The court granted the State's other-crimes motion in a detailed written order. After reciting the allegations here and from the earlier incident, as described above, the court found the eight years between the two incidents "not too remote" and found the cases sufficiently factually similar:

> "[Mr. Jones] in both incidents wants to have sexual relations with the victim. In the instant case, [Mr. Jones] took the victim to a motel room. He saw her undressed and began making sexual advances. Similarly, [Mr. Jones] in November 2011, attempted to touch the victim on numerous occasions—at the club, in the car ride to the motel room, and at the motel. Next, the victims are close in age. The victim in the present case is 24 and the victim in the prior incident was 21. [Mr. Jones] choses [*sic*] to power over the victim by either holding them down or attempting to make the victim unconscious. Even though the November 2011 incident had a third-party, [Mr. Jones] chose to get on top of the victim despite her pleadings. He continued to undress the victims and rape them. He ejaculated in the women without a condom."

The court found the other-crimes evidence relevant in that "physical evidence [was] found in both victims" as Mr. Jones "sexually assaulted his victims without a condom and with force." It stated

that the other-crimes evidence "may be used to show identity, intent, lack of consent, *modus operandi*, motive, propensity and *** to establish circumstances of [Mr. Jones]'s arrest, or to explain the recovery of evidence."

¶ 13    At the September 2021 trial, 25-year-old T.E. identified Mr. Jones as the man she met online and dated briefly in late 2019. On December 16, 2019, she agreed to meet him in a hotel room to "hang out" because she was interested in him. That evening, he drove her to a motel, where he booked a room while she stayed in the car. They both entered the motel room, where he stayed briefly before leaving to take a shower at home. While he was gone, she undressed and went to sleep on the bed. The bed had no visible stains when she lay down for her nap. She was awakened by Mr. Jones returning to the room. He sat down on the bed, where she was still undressed under the covers, and "tried to initiate sex." He asked why she agreed to meet in a motel room if not to have sex, and she said she was not ready. He said she was a waste of time and left the motel room. She locked the door and barred it with a table because it did not have a deadbolt.

¶ 14    Mr. Jones returned after about 10 or 15 minutes, which surprised T.E. She started to get dressed to leave. However, as she was pulling up her pants, he pulled them down. He started strangling her, putting both hands around her neck and squeezing until she could not breathe. He pushed her onto the bed, where she was face-up as he kneeled over her strangling her. She flailed her arms and legs until she passed out.

¶ 15    When she regained consciousness, she was face-down on the bed with Mr. Jones behind her with his penis inside her vagina. She never consented to sex with Mr. Jones. She saw in a mirror that her nose was bleeding onto the bed. Mr. Jones tried to have anal sex with her; his penis touched her anus but "didn't go in." It was painful, and she screamed. When he finished, they both got up from the bed and he said, "let's go." She did not know if he ejaculated.

¶ 16    T.E. left the motel with Mr. Jones, leaving her cellphone in the room. She felt she had no choice but to leave with him. She considered jumping from his car, but he took her home. T.E.'s mother was home, and after they spoke, her mother took T.E. back to the motel. There, they reported the incident. An ambulance came to the motel and T.E. told a paramedic what had happened. The ambulance took her to a hospital where she was examined and samples were taken. Police came to the hospital and showed her a photographic array, from which she identified Mr. Jones.

¶ 17    T.E. viewed security video from the motel, which was shown at trial. She pointed out the car arriving at the motel with Mr. Jones driving and herself as passenger. She pointed out Mr. Jones briefly walking away before they both went into the motel room. T.E. also pointed out both times when Mr. Jones left the motel room and returned. Lastly, she pointed out when she and Mr. Jones left the motel room, entered a car, and drove away. This court's review of the video shows it is consistent with T.E.'s description of the events.

¶ 18    T.E. identified various photographs as accurate depictions of her appearance after the incident at the motel. On photographs taken at the hospital, she pointed out injuries to her eyes, fingernail marks on her neck, and a scratch, none of which he she had before arriving at the motel. On photographs T.E.'s mother took a few weeks after the incident, T.E.'s eyes were still red.

¶ 19    On cross-examination, T.E. testified that, after meeting Mr. Jones online, she invited him to their first date at her home while her mother was not present. She was not afraid of him then, and they spent some time alone in her room. A few days later, she suggested meeting in a hotel room. She asked Mr. Jones for money for her recent manicure, but he did not give her any. T.E. brought a bag to the motel because she intended to stay overnight. However, "[w]e hadn't stated we were going to there to have sex. We were going there to spend time." She stayed in the room

after Mr. Jones expressed his desire to have sex because she had no ride home and he had left the room. He had expressed frustration but did not threaten her, and she was not afraid then.

¶ 20    However, Mr. Jones returned to the motel room. As he sat on the bed where T.E. was still undressed, she believed he wanted sex and she started to get dressed. When he pulled down her pants as she tried to put them on, she told him to stop and fought back. He then choked her, and she passed out. When Mr. Jones tried to have anal sex with her but stopped, he stopped because she screamed in pain. He offered her a ride home and did not force or threaten her into his car. T.E. explained that, "[a]fter he assaulted me, I didn't know what he was going to do." During the ride, she did not object to his earlier behavior because she feared he could kill her.

¶ 21    When she arrived home, T.E. went directly to her mother but did not look her in the face so that she would not be shocked by T.E.'s injuries. T.E. told her mother that someone had tried to kill her but did not mention being raped, though she did tell her mother later. T.E. asked her mother to take her back to the motel so she could report the incident where it occurred. T.E. admitted that she did not mention until shortly before trial that she asked Mr. Jones for money.

¶ 22    Paramedic Reva Acevedo testified that she responded on the night of December 16, 2019, to a report of a battery victim at a motel. There, she asked T.E. why an ambulance was called. T.E. said that "she had been raped anally, vaginally[,] and choked." Ms. Acevedo asked her about the incident and examined her for injuries. T.E. "had redness around her throat and some bleeding around her nose and mouth," which T.E. attributed to coughing up blood. However, her throat was not bruised or swollen. Ms. Acevedo brought her in the ambulance to a hospital.

¶ 23    Dr. Jasmine Ginn testified to examining T.E, who said she was raped and choked. Dr. Ginn "saw two subconjunctival hemorrhages in her eyes," or burst blood vessels in both eyes, and redness on her neck and chest. Such hemorrhages or petechiae tend to get worse before they get

better on their own, Dr. Ginn explained. She examined and took samples from T.E.'s vaginal area, seeing redness there. Such redness is consistent with sex and not necessarily indicative of trauma.

¶ 24     Detective James Fumo testified to interviewing T.E. while she was at the hospital on the early morning of December 17, 2019. He noticed petechial hemorrhaging or blood in her eyes. After Mr. Jones was arrested, T.E. identified him from a photo array. When Detective Fumo saw T.E. again on the evening of December 17, her petechial hemorrhaging was worse.

¶ 25     A police officer testified that the motel clerk provided a copy of a receipt and a debit card, and the officer located and arrested Mr. Jones. An evidence technician testified to photographing T.E.'s injuries and the motel room, including apparently blood-stained bedsheets. The parties stipulated that testing found Mr. Jones's DNA in sperm from T.E.'s vaginal swabs.

¶ 26     During trial, the State told the court that Mr. Jones's military conviction was reduced on appeal to wrongful sexual conduct. The court said it was not admitting the conviction but C.H.'s testimony regarding the incident, and the appeal did not impeach her account as Mr. Jones's conviction was not reversed outright. The court ruled that C.H. would be allowed to testify.

¶ 27     Prior to C.H.'s testimony, the State reminded the court that the defense wanted the jury instructed on other-crimes evidence before her testimony. However, defense counsel withdrew the requested instruction and asked the court not to read it. Counsel confirmed for the court that they discussed the decision with Mr. Jones and he "agreed to that trial strategy."

¶ 28     C.H., who was 31 years old as of the September 2021 trial, testified that she was in the Air Force in November 2011. She identified Mr. Jones as a fellow airman she met at a bar in November 2011, where she went with a friend and ended up drinking with other Air Force personnel. When the bar closed at 3 a.m., Mr. Jones and another airman invited C.H. and her friend to join them at a party. C.H. testified that, during the taxi ride to a hotel, Mr. Jones "kept putting his hands on me

and pulling me towards him, touching my wrists, my legs and my neck and trying to get me to talk with him" though she did not want him to. When they arrived at a hotel room, there were already others there and more people came later. During the party, Mr. Jones "pulled on, touched, tried to grab *** my breasts and my neck, telling me let's just have fun." She repeatedly told him "no" and that she "wasn't interested." At the end of the night, she was in a bed with Mr. Jones, who she believed to be asleep, and Mr. North. She spoke with, and then started kissing, Mr. North.

¶ 29    Mr. Jones then reached over and started lifting her dress. She said "no," and Mr. North stopped touching her, but Mr. Jones did not. Instead, Mr. Jones pulled up her dress and pulled down her underwear as she was on her back in bed and he was on top of her straddling her. Mr. North held her down by her shoulders as Mr. Jones "put his penis inside of my vagina. I did not ask for that." C.H. said "I did not want that," then went to the bathroom and stayed there for about a half-hour.

¶ 30    On cross-examination, C.H. testified that she kissed Mr. Jones at one point during the party to quiet him down, as she was concerned the noisy party would attract attention. As she was kissing Mr. North on the bed where Mr. Jones was apparently sleeping, she discussed with Mr. North that she never had "a threesome." She denied that she was referring to herself, Mr. North, and Mr. Jones.

¶ 31    During the jury instruction conference, the defense withdrew Illinois Pattern Jury Instructions, Criminal, No. 3.14 (approved Oct. 17, 2014) (hereinafter IPI 3.14), the instruction on other-crimes evidence. The court stated that it would have instructed the jury:

> "Evidence has been received that the Defendant has been involved in an offense
> other than those charged in the indictment. This evidence has been received on the issues
> of the Defendant's identification, intent, lack of consent, *modus operandi*, motive,

propensity and common scheme or design and may be considered by you only for that limited purpose.

It is for you to determine whether the Defendant was involved in the offense and, if so, what weight should be given to the evidence on the issue of identification, intent, lack of consent, *modus operandi*, motive, propensity and common scheme and design."

Defense counsel again confirmed for the court that withdrawing IPI 3.14 was a matter of trial strategy discussed with and approved by Mr. Jones.

¶ 32    The jury found Mr. Jones guilty of two counts of aggravated criminal sexual assault and one count of aggravated battery, finding him not guilty of attempted murder.

¶ 33    Defense counsel filed a written posttrial motion, but neither the motion nor counsel's argument on the motion challenged the admission of the other-crimes evidence. The court denied the posttrial motion.

¶ 34    Following a sentencing hearing, the court sentenced Mr. Jones to 10 years in prison for each of the two aggravated criminal sexual assault counts, to be served consecutively to each other and concurrently to a 5-year prison sentence for aggravated battery.

¶ 35                                    II. JURISDICTION

¶ 36    Mr. Jones was sentenced on December 29, 2021, and timely filed his notice of appeal on January 12, 2022. We have jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rules 603 and 606, governing appeals from final judgments of conviction in criminal cases (Ill. S. Ct. R. 603 (eff. Feb. 6, 2013), R. 606 (eff. Dec. 11, 2014)).

¶ 37                     III. ANALYSIS

¶ 38              A. Admission of Evidence Regarding C. H.

¶ 39     On appeal, Mr. Jones first contends that the trial court erred in admitting evidence of the prior incident with C.H. because it bore only minimal similarity to the charged offenses and was more prejudicial than probative.

¶ 40     The State responds that the court did not err in admitting C.H.'s testimony regarding her sexual assault by Mr. Jones because it was more probative than prejudicial and was admissible to show Mr. Jones's identity, intent, lack of consent, motive, and propensity.

¶ 41     As a threshold matter, we note that trial counsel did not challenge the admission of other-crimes evidence in the posttrial motion. Generally, a claim is forfeited if it is not raised before or during trial and preserved in the posttrial motion. *People v. Price*, 2021 IL App (4th) 190043, ¶ 167. Mr. Jones contends that we may consider this contention as plain error and that trial counsel was ineffective for not preserving the contention.

¶ 42     Under the plain-error doctrine, a reviewing court will consider an unpreserved error when it is clear or obvious and either (1) the evidence was so closely balanced that the error alone threatened to tip the scales of justice against the defendant, or (2) the error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process. *Id.* ¶ 168. The first step under either prong of plain error analysis is determining whether there was a clear or obvious error. *People v. Sebby*, 2017 IL 119445, ¶ 49. Here, we find no such error.

¶ 43     Section 115-7.3 of the Code (725 ILCS 5/115-7.3 (West 2018)) provides that, in cases where specified sex offenses and sexually-motivated offenses are charged, evidence of other such offenses may be admitted "for its bearing on any matter to which it is relevant." *Id.* § 115-7.3(b). The specified offenses include criminal sexual assault and aggravated criminal sexual assault. *Id.*

§ 115-7.3(a)(1).

¶ 44    Other-crimes evidence is generally admissible not to show propensity but only as evidence of "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). Section 115-7.3, however, allows other-crimes evidence to be used in sex-offense cases to show propensity to commit such an offense. *People v. Ward*, 2011 IL 108690, ¶¶ 24-25. While "the principal source of undue prejudice from typical other-crimes evidence is its tendency to show *** the defendant's propensity," "section 115-7.3 mandates explicitly that propensity evidence not be considered *per se* a source of undue prejudice." *People v. Walston*, 386 Ill. App. 3d 598, 614-15 (2008).

¶ 45    But section 115-7.3 still requires the court to weigh "the probative value of the evidence against undue prejudice to the defendant." The statute provides:

> "In weighing the probative value of the evidence against undue prejudice to the defendant, the court may consider:
>
>> (1) the proximity in time to the charged or predicate offense;
>>
>> (2) the degree of factual similarity to the charged or predicate offense; or
>>
>> (3) other relevant facts and circumstances." 725 ILCS 5/115-7.3(c) (West 2018).

¶ 46    Thus, the possible undue prejudice under section 115-7.3 does not result from using evidence to show a defendant's propensity to commit sex crimes but, instead, results from using evidence simply to reflect poorly on the defendant. As we explained in *People v. Smith*, 406 Ill. App. 3d 747, 751 (3d Dist. 2010), under the statute the court is "to avoid admitting evidence that entices a jury to find defendant guilty *only* because it feels he is a bad person deserving punishment, rather than basing its verdict on proof specific to the offense charged." (Emphasis in original.)

¶ 47 Proximity in time is a relevant factor in the statutory balancing but is not controlling by itself and is applied on a case-by-case basis. *People v. Donoho*, 204 Ill. 2d 159, 183 (2003). Regarding factual similarities, as they "increase, so does the relevance, or probative value, of the other-crimes evidence," but general similarity will suffice for admissibility except to show *modus operandi*. *Id.* at 184. "The existence of some differences between the prior offense and the current charge does not defeat admissibility because no two independent crimes are identical." *Id.* at 185. In determining the admissibility of evidence, a court must concern itself only with prejudice that is undue or unfair; that is, it casts a negative light on a defendant for reasons that have nothing to do with the case being tried. *People v. Gordon*, 2017 IL App (3d) 140770, ¶ 25.

¶ 48 We review a ruling on the admission of other-crimes evidence for an abuse of discretion, reversing when the ruling was arbitrary or fanciful, or when no reasonable person would agree with it. *Ward*, 2011 IL 108690, ¶ 21.

¶ 49 Here, we find the trial court did not abuse its discretion in admitting C.H.'s testimony to Mr. Jones's November 2011 sexual assault. As Mr. Jones points out, the incidents have some significant differences, but they are also similar. Both T.E. and C.H. were women in their early 20s who encountered Mr. Jones socially and chose to go with him at night to a hotel or motel room. Both were in bed in a hotel or motel room after having clearly rejected Mr. Jones's sexual advance when he forced himself upon each of them. In both incidents, Mr. Jones showed an apparent lack of concern that he could be linked to the incident. Specifically, the incident with C.H. occurred while others were present, and Mr. Jones booked the motel room in this case in his own name.

¶ 50 As stated above, evidence is unduly prejudicial if it will cast a negative light on a defendant for reasons that have nothing to do with the case at hand. *Gordon*, 2017 IL App (3d) 140770, ¶ 25. However, C.H.'s other-crimes evidence does not cast a negative light on Mr. Jones for reasons that

have nothing to do with this case. Rather, the prior incident with C.H. where Mr. Jones had sex without consent when he could not get consent corroborated T.E.'s testimony that he did the same to her.

¶ 51 The differences between the two incidents arise from the different social circumstances: a party with others present in C.H.'s incident, a date with only Mr. Jones and T.E. present here. We see nothing in the earlier incident, which was less physically violent than the incident here, that would cast a negative light on Mr. Jones for reasons other than showing his propensity. In both instances, Mr. Jones forced himself onto a victim who was subdued. In the incident with C.H., someone held the victim down for Mr. Jones, while in the instant case Mr. Jones choked T.E., rendering her unconscious. Importantly, both incidents show Mr. Jones's propensity to force sex with a young woman he meets socially and wants to have sex with when she refuses consent. That is a permissible use of evidence under section 115-7.3.

¶ 52 In sum, we cannot conclude that no reasonable person would agree with the trial court's decision to admit C.H.'s other-crimes evidence, nor that the decision was arbitrary or fanciful. As there was no error, there was no clear or obvious error for plain-error purposes. Similarly, without error, Mr. Jones was not prejudiced when trial counsel did not preserve a meritless claim. See *People v. Jefferson*, 2021 IL App (2d) 190179, ¶ 30 (to show ineffectiveness from counsel's action or inaction, a defendant must show prejudice—that is, a reasonable probability of a different outcome; counsel is not ineffective for not preserving a meritless claim).

¶ 53                    B. Withdrawal of Limiting Instruction

¶ 54 Mr. Jones also contends that trial counsel was ineffective for withdrawing IPI 3.14, the limiting jury instruction on other-crimes evidence. The State responds that counsel withdrawing IPI 3.14 was a matter of trial strategy and therefore cannot support a claim for ineffective assistance

of counsel.

¶ 55    To show ineffective assistance, a defendant must show both that counsel made an objectively unreasonable decision and that counsel's decision prejudiced the defendant; that is, it is reasonably likely that the outcome of the proceedings would be different absent counsel's decision. *People v. Lewis*, 2022 IL 126705, ¶¶ 44, 46. In showing an unreasonable decision by counsel, a defendant must overcome the strong presumption that counsel's conduct may be considered the result of sound trial strategy. *Id.* ¶ 44. Moreover, because a defendant must show both an unreasonable decision and prejudice, even an objectively unreasonable decision is not grounds for reversal if the defendant was not prejudiced by it. *Jefferson*, 2021 IL App (2d) 190179, ¶ 30.

¶ 56    IPI 3.14 is titled "Proof Of Other Offenses Or Conduct" and states, before modification for a particular case:

> "Evidence has been received that the defendant[s] [(has) (have)] been involved in [(an offense) (offenses) (conduct)] other than [(that) (those)] charged in the [(indictment) (information) (complaint)].
>
> [2] This evidence has been received on the issue[s] of the [(defendant's) (defendants')] [(identification) (presence) (intent) (motive) (design) (knowledge) (____)] and may be considered by you only for that limited purpose.
>
> [3] It is for you to determine [whether the defendant[s] [(was) (were)] involved in [(that) (those)] [(offense) (offenses) (conduct)] and, if so,] what weight should be given to this evidence on the issue[s] of ____."

¶ 57    As noted above (*supra* ¶ 44), outside of the sex offenses listed in section 115-7.3, other-crimes evidence is generally not admissible to demonstrate a defendant's propensity to commit a

crime, but only for other purposes. "The great fear of other-crimes evidence—and thus the reason for [IPI 3.14]—is that the jury may consider other-crimes evidence for a *propensity* inference." (Emphasis in original.) *People v. Potts*, 2021 IL App (1st) 161219, ¶ 187. "The whole point of giving [IPI 3.14] is to *prevent* the jury from *** considering evidence for the purposes of propensity—by listing the exclusive, *non*-propensity purpose(s) for which the jury may consider the other-crimes evidence." (Emphases in original.) *Id.* ¶ 190. Thus, it is unclear to this court whether IPI 3.14 could serve any useful purpose where, as in this case, the other-crimes evidence was all properly admitted to show propensity.

¶ 58    In any event, assuming that in some case it would be in the defendant's interest to seek such an instruction, there would also be strategic reasons to avoid such an instruction. As we recognized in *Potts*, 2021 IL App (1st) 161219, ¶ 184, there are "real dangers to the defense in precisely 'delineating' the permissible use(s) of each item of other-crimes evidence in a jury instruction." Such an instruction could "risk drawing undue attention to damaging evidence." *Id.* There are "good reasons why the defense might not *want* this kind of instruction, *** *especially* when one of th[e] issues is propensity." (Emphases in original.) *Id.*

¶ 59    Here, we need not infer or presume that trial counsel's decision to not seek IPI 3.14 was the result of trial strategy. The record shows counsel told the trial court twice—when they declined IPI 3.14 before C.H.'s testimony and again in the general jury instruction conference—that choosing not to give the instruction was a matter of trial strategy discussed with and approved by Mr. Jones. We find that Mr. Jones has failed to show that strategy was unsound or that he was prejudiced by it. The other-crimes evidence here was admitted for purposes including propensity under section 115-7.3. The usual purpose of IPI 3.14 being to prevent a jury from using other-crimes evidence for propensity, an IPI 3.14 instruction was of limited or no value here. Giving the

jury IPI 3.14 would have limited essentially nothing, as the jury would have been instructed it could use C.H.'s testimony for propensity, and it could have harmed the defense case insofar as it would have called attention to all the ways the jury could use C.H.'s testimony. We conclude that Mr. Jones has failed to show ineffective assistance by trial counsel from not seeking IPI 3.14.

¶ 60                                 IV. CONCLUSION

¶ 61      For the foregoing reasons, the judgment of the trial court is affirmed.

¶ 62      Affirmed.