NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 241309-U

NO. 4-24-1309

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
December 17, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Cass County |
| RUSSELL J. LUCAS JR., | ) | No. 23CF38 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Timothy J. Wessel, |
| | ) | Judge Presiding. |

JUSTICE KNECHT delivered the judgment of the court.
Justices Steigmann and Doherty concurred in the judgment.

**ORDER**

¶ 1     *Held*: The appellate court affirmed defendant's convictions and sentences for criminal sexual assault, domestic battery, and obstructing justice where defendant failed to establish any error occurred relating to his claims other-crimes evidence was improperly introduced, the prosecutor engaged in misconduct, his trial counsel rendered ineffective assistance, and the trial court imposed an improper double enhancement during sentencing.

¶ 2     Following a jury trial, defendant, Russell J. Lucas Jr., was convicted of criminal sexual assault (720 ILCS 5/11-1.20(a)(3) (West 2022)), domestic battery (*id.* § 12-3.2(a)(2)), and obstructing justice (*id.* § 31-4(a)(1)). Defendant was sentenced to concurrent terms of 3 years' imprisonment for domestic battery and obstructing justice and to a consecutive term of 11 years' imprisonment for criminal sexual assault. Defendant appeals, arguing (1) the improper introduction of other-crimes evidence deprived him of a fair trial, (2) the prosecutor engaged in misconduct that rendered his trial unfair, (3) his trial counsel was ineffective, and (4) the trial court

erroneously imposed a double enhancement during sentencing. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4                                    A. The Charges

¶ 5          On August 18, 2023, defendant was charged with the aforementioned offenses, as well as attempted criminal sexual assault (*id.* §§ 8-4(a), 11-1.20(a)), and unlawful possession of methamphetamine (720 ILCS 646/60(a), (b)(1) (West 2022)). The charges alleged, in July 2022, defendant placed his penis in the vagina of Michaela M., his stepdaughter, who was then younger than 18. Additionally, on July 2, 2023, defendant attempted to place his penis in Michaela's vagina by the use of force, struck her in the face, and concealed evidence of sexual abuse by taking her cell phone. Finally, it was alleged that on August 17, 2023, defendant possessed less than five grams of a substance containing methamphetamine.

¶ 6                                    B. Pretrial Motions

¶ 7          On July 8, 2024, the trial court held a hearing to address several pretrial motions. Among these were defendant's motion to sever the methamphetamine count from the remaining charges and a motion *in limine* to bar evidence that Michaela had accused defendant of sexually assaulting her prior to the events at issue in this case, despite the potential admissibility of such evidence pursuant to section 115-7.3 of the Code of Criminal Procedure of 1963 (Procedure Code) (725 ILCS 5/115-7.3 (West 2024)). In turn, the State filed a notice to impeach defendant with prior convictions if he testified at trial. The State also filed a motion *in limine* pursuant to section 115-7 of the Procedure Code (*id.* § 115-7), commonly known as the rape shield statute, to bar evidence of Michaela's sexual history with anyone other than defendant. Additionally, the State filed a response to defendant's motion *in limine* to bar evidence of Michaela's allegations of sexual assaults prior to the events of the instant case. Therein, the State argued evidence of an alleged

sexual assault committed by defendant against Michaela in 2019 was admissible under section 115-7.3 because, *inter alia*, the alleged assault occurred close in time to the charged offense, the assault was probative in that it was factually similar to the charged offense, and the State disclosed the evidence prior to trial.

¶ 8        The trial court granted defendant's motion to sever the methamphetamine count before turning to the State's notice of intent to impeach defendant. The notice indicated if defendant chose to testify, he could be impeached with his (1) felony conviction of theft from 2022, (2) misdemeanor conviction of retail theft from 2013, and (3) felony conviction of burglary from 2011. However, at the hearing, the State acknowledged only the 2022 theft conviction would be proper for impeachment, as the remaining convictions were too old. The court agreed and ruled, if defendant testified, the State could impeach him with his 2022 theft conviction, while the remaining two convictions "will not be brought up."

¶ 9        The trial court next considered the State's motion *in limine* pursuant to the rape shield statute. The court granted the motion, barring any testimony of Michaela's prior sexual activity "as to any other individuals." The court explained the admissibility of any testimony regarding prior sexual activity between Michaela and defendant would be considered at the time it arose, and defendant's counsel was instructed to make a proffer before engaging in any such questioning.

¶ 10       Thereafter, the trial court addressed defendant's motion *in limine* to bar evidence Michaela accused defendant of sexually assaulting her prior to the events at issue in the instant case. The court asked defendant's counsel whether he agreed the matter had "already [been] addressed," given its ruling on the State's motion *in limine* pursuant to the rape shield statute. Counsel agreed the issue had been addressed, and the court concluded the motion *in limine* was

moot.

¶ 11                                    C. Trial Evidence

¶ 12        Defendant's jury trial commenced on July 15, 2024. The State presented testimony from Michaela; Michaela's mother, Jessica M,; Michaela's grandmother, Judy M.; and two police officers. The State also introduced text message conversations defendant had with Michaela and Jessica and photographs of Michaela. Defendant testified and also presented the testimony of his father, Russell Lucas Sr. (Russell Sr.); his mother, Patricia Michael; and his son, Russell Lucas III (Russell Jr.). The following is gleaned from the evidence presented.

¶ 13        Michaela was born in October 2004 and was 19 at the time of trial. In July 2023, she was living at a residence in Bluff Springs, Illinois, with family members, including Jessica, Judy, defendant, Russell Sr., and Russell Jr. On July 2, 2023, she was in her bedroom in the basement of the residence, watching television and looking at her phone on her bed. According to Michaela, she looked up from her phone to see defendant in her room, having entered with a credit card he referred to as "his key." Michaela told him to go away, but he got into bed with her. She then told him she was worried about things she needed for school, and defendant responded he would not help her with anything if she did not have sex with him. Defendant told her she was "better than [Jessica]" and was "trying to like replace her," but Michaela told him she did not "want that." Defendant touched Michaela on her thigh, and she began to object. Defendant briefly got up, and Michaela asked him, "[A]re you not going to help me *** for school because I won't have sex with you?" and defendant responded, "[O]nce in a while wouldn't hurt." Defendant then returned to the bed, "forced [Michaela's] legs open," and began touching her vagina with his hand. Michaela screamed, "no," and, "get off me," but defendant did not stop. Defendant's penis made contact with Michaela's vagina but did not penetrate it because Michaela was kicking and

- 4 -

screaming.

¶ 14    Defendant then got up and walked upstairs, and Michaela followed. She went to the living room, where Judy was watching television, and told her defendant "tried to assault me again." Defendant denied Michaela's accusations, claiming he was "in his father's room the whole time." He then texted Michaela she was "stupid" because Judy would relay her accusations to Jessica, who was not home at the time. Michaela attempted to show Judy this message, but defendant grabbed the phone and ran outside. Michaela followed him through the yard, yelling at him to give her the phone. When Michaela caught up to defendant, she grabbed his shirt, and defendant hit her head with the phone and kicked her left leg. Thereafter, defendant got in his car and drove away with Michaela's phone. After he left, the police were called.

¶ 15    Cass County Sheriff's Deputy Adam Demaree responded to the scene at 5:40 p.m., and he spoke to Michaela and Judy about what occurred. Demaree observed a red mark on Michaela's left cheek and ear, and a photograph showing the redness on her face and ear was entered into evidence. Demaree suggested Michaela go to the hospital to receive a sexual assault kit, and Judy took her to Springfield Memorial Hospital. Demaree and Illinois State Police Special Agent Sergio Rodriguez, who was assigned to investigate the sexual assault, acknowledged no police officer entered the house or observed the bedroom where the incident occurred, nor were any bedsheets or clothing collected. They also acknowledged the sexual assault kit ultimately returned negative for defendant's DNA, though Rodriguez testified, in his training and experience, it was possible a sexual assault had occurred despite the inability to recover DNA, hair follicles, or discharge.

¶ 16    Judy called Jessica and told her to come home, which Jessica did. When Jessica arrived, she learned Michaela "was accusing [defendant] of raping her" on several occasions,

- 5 -

including when she was under 18. Jessica did not see defendant again until several days later, though she texted with him between July 2, 2023, and July 5, 2023. Defendant's counsel had "no objection" to the admission of the text messages as State's group exhibit No. 3, "subject to cross[-]examination," and the messages were admitted into evidence.

¶ 17 Several messages pertained to Jessica's learning Michaela was accusing defendant of having sex with her before she turned 18. In these messages, Jessica accused defendant of being a "pedophile" and stated, "You like touching little girls. So go ahead and act like you're a God. I'm sure God didn't f*** his daughter." She further stated, "I'll just go ahead and blast to the world how you f*** kids and f*** your step daughter and what kind of real trash you are." Defendant responded, in part, "Go ahead an do whatever you think is right idc over ya threting me like I owe you something now quit messageing me thank you [*sic*]." Jessica also texted defendant, "I bend over backwards for you and nothing I do is enough for you. So good be done. You were done 18months [*sic*] ago when u f*** my child." She also told defendant "I'm slitting your throat if I see your a***. F*** pedophile." Jessica later texted, "It all makes sense now. How we went months without sex in [Jacksonville, Illinois]. You were f*** my 14 yr old you didn't need me."

¶ 18 When asked about these messages, Jessica acknowledged she accused defendant of being a pedophile because "[a]t that point I was under the impression that he was having a sexual relationship with my daughter." She qualified, however, that "whether she was 18 or not I don't know." She explained, when she discussed Michaela's allegations with her at one point, Michaela initially told her "it happened the summer before [(in 2022)] *** and then later on she told me that it didn't actually happen the summer before." According to Jessica, Michaela told her in December 2023 defendant "never tried to rape her but she just kind of made that up," and "everything [defendant] is telling you is made up." Michaela also told her the encounters with defendant were

consensual and that she had provided defendant with condoms. Jessica thus claimed, while she agreed defendant and Michaela had a sexual relationship in the summer of 2023, she no longer believed that relationship existed prior to October 2022, when Michaela was under 18. Further, when asked about a text Jessica sent to defendant accusing him of lying about the "first time" he and Michaela had sex, she claimed that by "first time," she was referring to an encounter defendant told her had occurred a "couple days prior" to July 2, 2023, in which he rubbed lotion on Michaela then had sex with her. Jessica claimed she did not believe she asked defendant about any encounters from 2022, nor did she believe any of defendant's texts referred to any encounters in the summer of 2022, because "[she] assumed that it was from 2023."

¶ 19        The prosecutor asked Jessica about her actions following Michaela's purported recantation in the following exchange:

"Q. You didn't go to the police and say hey these things didn't happen?

A. No.

Q. You didn't go to—you didn't come to me and my office?

A. No.

Q. Knowing that your husband was on trial and tell me these things didn't happen?

A. No.

Q. In fact the first time you spoke with me about this was July 8 just last week, is that correct?

A. I believe so, yes.

Q. And when we talked I asked you if you believed that your daughter and the Defendant were having sex in 2022 and you told me yes, isn't that correct?

A. I don't remember."

¶ 20 Other texts referred to defendant's apparent efforts to hinder the investigation of Michaela's allegations. For example, Jessica texted defendant there was a "state wide APB [(all-points bulletin)] out for ya." Defendant responded, "An that is fine as long as I have gas I'll run them play catch me if you can guess ya don't understand that if I'm cought then I'm no help to any of you [*sic*]." Additionally, defendant texted Jessica, "Dum as f*** they took her phone bet ya dum a*** didn't even get rid of anything off of it either did ya," and, "your stupid f*** a*** can't even do simple a*** s*** when you can [*sic*]." Defendant continued, "at some point we need to clear our conversation cuz I'm sure they are going to get a warrant for all of our phones."

¶ 21 Another text message referred to a purported sexual encounter between defendant and a 13-year-old girl. Specifically, Jessica had texted defendant she "[t]old Michaela u slept with a 13 yr old what a f*** piece of work." As to that message, the State opined to Jessica, "The Defendant made a statement that he had slept with a 13 year old. Let's talk about that." Defendant's counsel objected, stating, "This is outside of anything we have talked about before Your Honor." Following an off-the-record discussion at the bench, the trial court informed the prosecutor, "[I]f the answer is no, then no further." Thereafter, the State asked Jessica, "[D]o you have any knowledge regarding that text message?" and she replied, Michaela "told me [defendant] told her so it's hearsay." The State responded, "Yes or no. Did you have any personal knowledge," and Jessica answered, "No." Defendant's counsel immediately asked the court to instruct the jury "to disregard that then," and the court instructed the jury, "[S]ince this witness has no personal knowledge I ask that you disregard the statement in that text message."

¶ 22 The State also introduced a phone call Jessica made to defendant on July 5, 2023, that was recorded by Rodriguez upon Jessica's consent. That recording was entered into evidence

and played for the jury. In the recording, which this court has reviewed, Jessica asked defendant to tell her "what happened with Michaela back when she was 14." Defendant initially denied that anything had happened while she was 14 while he, Michaela, and Jessica were living in Jacksonville, but he later acknowledged "a couple times she had her f*** hands in my pants." Moreover, after Jessica asked defendant several times to explain what happened "last summer," defendant admitted he had sex with Michaela "two or three" times.

¶ 23        Michaela testified she retrieved her phone several days following the July 2, 2023, incident after someone gave it to Jessica. When she received it, she noticed she was temporarily locked out of her phone due to a security feature that triggers after too many incorrect password attempts. According to Michaela, she knew defendant was trying to access her phone to destroy evidence because at some point prior to her retrieving it, Patricia told her to give defendant the password "or he was going to throw the phone in the creek or destroy it." Among the items on her phone she feared defendant was trying to destroy were screenshots of text messages from August 2022 in which defendant admitted to having sex with her previously, including while she was under 18. Specifically, Michaela testified one assault occurred in the summer of 2022, when she was 17 years old. On that occasion, defendant gave her marijuana and rubbed lotion on her back before touching her vagina with his hand and penetrating her vagina with his penis.

¶ 24        On July 5, 2023, Michaela gave Rodriguez consent to extract information from her phone. Rodriguez recovered screenshots of an explicit text conversation between defendant and Michaela. Rodriguez testified the screenshots' metadata showed they were created on August 9, 2022. These screenshots were entered into evidence after defendant's counsel noted he had no objection "[s]ubject to cross[-]examination." In the messages, defendant stated he was frustrated about "it only being a 1 way street." During her testimony, Michaela clarified defendant was telling

her "not to ask him for anything" else because he believed she only "used him *** [to] get my stuff going into college" and then began to withhold sex from him. She testified the situation was "never something I wanted." Michaela texted defendant, "I don't want to have sex," and, "yk that," and defendant responded, "Well sorry I love u an that ya got me sprung on u." Defendant also stated, "Not just sex," but he did not "see the problem of us hooking up like once in awhile I love everything about you sorry for that to I just want to eat ya." Defendant continued he "didn't know our relationship was un normal no an I thought u came bak to be around me how the f*** u thought I wasn't going to hit is just r***." Michaela told defendant she did not love him "the way you love me," and defendant responded, "after all we have done how can u love me any other way?" Defendant told Michaela he was "pist cuz of how I let u use me [sic]," and Michaela responded, "the first time I didn't want that and the second time I was high." Michaela testified "the first time" referred to a sexual assault that occurred when she was 14; the "second time" referred to the assault from the summer of 2022, when defendant gave her marijuana, rubbed lotion on her back, and penetrated her vagina with his penis. Defendant did not object to this testimony. Michaela also told defendant she "didn't use [him]" and was "upset because this is out of the blue." She explained to him, whenever they were together, he would "make it sexual," and defendant responded, "sorry u have a great p*** *** we ain't gotta f*** all the time just some times I love to just taste u *** an if you didn't love me then u wouldn't have came bak let alone slept with me [*sic*]." In response, Michaela repeated, "I DON'T WANT TO DO ANYTHING SEXUAL," and stated she was "stressing over this" because "all u want is sex." Defendant continued, "I knew when u called an said u wanted to come home we were going to hook up an we did an your still amazing [*sic*]."

¶ 25        Michaela testified defendant had on several occasions tried to "keep [her] quiet" about their sexual interactions. She explained that on one occasion, "after the assault when I was

14," she was living in Kansas City, Missouri, with her father but wanted to live at Jessica's residence. She testified defendant and Jessica would not let her live with them unless she wrote a letter stating no sexual encounters occurred between her and defendant in 2019. Defendant did not object to this testimony. Michaela denied (1) texting any sexual messages from defendant's phone to her phone, (2) fabricating defendant's sexual acts to blackmail him into paying for her college expenses, and (3) telling Jessia defendant never assaulted her.

¶ 26 According to Rodriguez, officers made several failed attempts to locate defendant, but he was ultimately found at another individual's residence on August 17, 2023, and apprehended as he attempted to exit the residence through a window.

¶ 27 Defendant denied Michaela's allegations, contending his sexual encounters with her were consensual. Specifically, he claimed one encounter occurred in April 2023—after Michaela turned 18—when he picked her up from school in St. Louis, Missouri, so she could obtain her Social Security card and birth certificate. Defendant drove her to the residence in Bluff Springs. He claimed the evening after their return to Bluff Springs, Michaela initiated a consensual sexual encounter in the upstairs bathroom of the residence. Michaela provided defendant with a condom. He later drove Michaela back to St. Louis.

¶ 28 Defendant claimed, on another occasion in June 2023, Michaela moved back to Bluff Springs from Kansas City after she was unable to pay rent, and defendant and Judy let her stay in the bedroom in the basement. Defendant testified the day they returned home, he and Michaela had another sexual encounter on the front porch while they "[p]robably" smoked marijuana.

¶ 29 As to the July 2, 2023, incident, defendant, Russell Sr., and Russell Jr. explained defendant was helping Russell Sr. clean his bedroom until approximately 3:30 p.m., at which point

defendant went to Russell Jr.'s bedroom to play video games for about 30 minutes before going back to Russell Sr.'s room. The prosecutor asked Russell Jr. whether he ever told law enforcement or came "to my office and tell me" his "side of the s[to]ry." Russell Jr. answered, "No." Similarly, the prosecutor asked Russell Sr. whether it was correct that, although Russell Sr. had "seen me in the hallway," he never told him his "side of the story." Russell Sr. responded, "No."

¶ 30      According to defendant, after playing video games, he went back downstairs to continue helping Russell Sr., during which time he heard Michaela screaming. Defendant stepped out of the bedroom to see what was happening, and Michaela told Judy, who was sitting in the living room, defendant "was just in the basement" and "just tried to force [himself] on her." When he heard this, defendant texted Michaela "it was bulls*** that she was telling [Judy] bulls*** to keep drama going." Michaela handed Judy her phone, and defendant took it because he was "mad that [Michaela] was trying to show [Judy]" the message he just sent her. Defendant ran outside, followed by Michaela, and he refused to give the phone back because she kept starting "drama." Michaela kept attempting to grab defendant and the phone, and she ripped off defendant's shirt as he tried to get away. Defendant testified he did not strike her with the phone and was eventually able to leave the scene.

¶ 31      Defendant also testified he did not intend to hide evidence on the phone from law enforcement because he did not know any evidence would be found there. He claimed he had "never seen the supposed screenshots" of sexual conversations with Michaela, and he believed Michaela sent the messages to herself because she "used [his] phone all the time." He did not attempt to gain access to the contents of her phone and did not intend to delete anything from it; he only shut it off. He also noted he did not know there was a warrant for his arrest.

¶ 32      Defendant noted he had a learning disability, attention deficit disorder, and

attention-deficit/hyperactivity disorder. When he used marijuana, it both helped with his disabilities and caused more problems. According to defendant, he was high during the July 5, 2023, phone call with Jessica that was recorded by Rodriguez. As a result, when Jessica asked him to explain what happened "last summer," he did not "comprehend that she meant anything outside of '23." Accordingly, when he said he had sex with Michaela "two or three" times, he was referring to the sexual encounters he had with her in April and June 2023.

¶ 33        Defendant also acknowledged he was a felon. When his counsel asked, "And that relates to what?" defendant responded, "Burglary to the bar across the street here, Goodtimes, in 2011, I want to say August."

¶ 34        On cross-examination, the prosecutor asked whether defendant had "contact[ed] the police about what had happened at any time," and defendant responded, "No, sir." The following exchange occurred thereafter:

> "Q. Okay. Would you agree that the first time, you sitting here in court today, that speaking with law enforcement prior to today, law enforcement officers, myself, any other court officers that today as you sit there is the first time that you're telling us that—
>
> [DEFENSE COUNSEL]: I'll object to that question, [Y]our Honor. I don't think it's proper."

Following a sidebar—the details of which do not appear in the transcript—the following exchange between the prosecutor and defendant occurred:

> "Q. [Defendant], your comprehension issues that you testified to here today, Michaela, her birth certificate, that she came to you, that she was the one coming on to you, you have not brought this information to anybody previously; correct?

- 13 -

A. The only person that ever tried to speak to me about any of this was Mr. Rodriguez and I didn't refuse to speak to him. I asked for an attorney.

Q. Okay, very good.

A. So I would still had spoke to him had he gave me an attorney. [*sic*]"

¶ 35                    D. Closing Argument and Jury Deliberations

¶ 36        During closing argument, the prosecutor opined the jury had an opportunity to "sit here and judge [Jessica's] credibility" and commented her "mind got a little fuzzy" when he asked her questions. The prosecutor continued:

"Most specifically I just talked to her on July 8th, 2024, not even 10 days ago, and she couldn't recall what we talked about, but she was very specific when she was talking about answers when [defendant's counsel] was questioning her. She remembered things from December of 2023, prior to that, and when it benefited the defendant. However, when I was asking her simple questions about, well, what did we talk about two weeks ago, her memory just got a little bit fuzzy when I was asking her questions."

¶ 37        In arguing defendant committed the offense of obstructing justice, the prosecutor opined the evidence showed "a few instances of the defendant asking not only his stepdaughter but also his wife to delete messages off the phone after he's taken her phone." The prosecutor contended this evidenced an "intent *** to delete damning information," indicating an "intent to obstruct prosecution." That suggested, the prosecutor concluded, defendant "knowingly did this when he took the phone and texted *** messages [to Michaela and Jessica] regarding deleting things."

¶ 38        Thereafter, the prosecutor noted the "people who were in the home, who were very

closely related to the defendant, *** would get up there and say anything to you to make sure [defendant] would not get in trouble." The prosecutor emphasized Russell Sr. never informed the State defendant did not commit the acts of which he was accused and commented the jury "get[s] to judge the credibility." Additionally, he stated Jessica was one of the least credible witnesses because, although Jessica's mind was "very fuzzy at times where it was important for us to get crucial information" and she had difficulty remembering information when the prosecutor "talked to her two weeks ago," she had no such difficulty "when it came to self-serving statements regarding the defendant." The prosecutor argued Michaela, in contrast, answered questions "truthfully and competently because she told you what happened."

¶ 39    Following closing arguments, the trial court instructed the jury, *inter alia*, to disregard testimony and exhibits the court refused or had stricken and that the only evidence to be considered was the testimony of the witnesses, exhibits that had been received, and stipulations. The court also instructed the jury neither opening statements nor closing arguments were evidence and to disregard any statement or argument made by the attorneys not based on the evidence.

¶ 40    Thereafter, the jury began its deliberations. While the jury deliberated, defendant's counsel informed the trial court he had two objections he did not raise during the State's argument because he "did not want to interrupt." Specifically, he asserted the State's arguments regarding Russell Sr.'s failure to tell the prosecutor defendant did not commit the alleged offenses improperly shifted the burden to the defense. The State responded the argument was proper to address potential bias or credibility issues regarding Russell Sr. The court agreed with the State and rejected defendant's objection. Counsel also objected to the admission of any portions of the text message exhibits he and the prosecutor did not explicitly question witnesses about. The court rejected this objection, noting it considered the admissibility and foundation of the messages, and all of them

had been admitted.

¶ 41　　　The jury found defendant guilty of criminal sexual assault, domestic battery, and obstructing justice and not guilty of attempted criminal sexual assault.

¶ 42　　　　　　　　　　　　D. Sentencing

¶ 43　　　A sentencing hearing was held on August 19, 2024. The trial court first denied defendant's posttrial motions, which asserted, *inter alia*, the court erred in denying his motions *in limine* prior to trial. Thereafter, in recommending a sentence, the prosecutor argued, considering defendant had sex with Michaela when she was under 18 years old, he could not "imagine the type of trauma that that poor girl will still have." The prosecutor continued, "In speaking with her during the trial, she definitely has some things that she will have to work through for a number of years."

¶ 44　　　In rendering its sentence, the trial court stated, *inter alia*, "[W]hen I look at the factors of aggravation, I look at, Did this cause harm? This caused great harm. You took the innocence of a young girl." The court also considered defendant's criminal history, which included "multiple other felonies"; defendant's position as a father figure, which obligated him to prevent crime to Michaela; and the need to deter others. The court sentenced defendant to concurrent 3-year prison sentences for domestic battery and obstructing justice and a consecutive sentence of 11 years for criminal sexual assault.

¶ 45　　　Defendant filed a motion to reconsider the sentence, arguing the sentence was excessive in that the trial court failed to properly weigh the factors in aggravation and mitigation, and the court should have found him eligible for drug rehabilitation while in prison. The court granted defendant's request that he be recommended as eligible for drug rehabilitation but otherwise denied the motion to reconsider.

¶ 46　　　This appeal followed.

¶ 47                                    II. ANALYSIS

¶ 48        Defendant raises four issues on appeal: (1) the improper introduction of other-crimes evidence regarding sexual encounters between himself and other individuals, including Michaela, while they were minors deprived him of a fair trial; (2) the prosecutor engaged in multiple instances of misconduct, which rendered his trial unfair; (3) his trial counsel was ineffective due to several failures; and (4) the trial court improperly imposed a double enhancement during sentencing by considering the "great harm" Michaela suffered.

¶ 49        Initially, we note defendant concedes he forfeited all but his ineffective assistance claims because his counsel either did not object to raise those issues or did not include them in a posttrial motion. See *People v. Hillier*, 237 Ill. 2d 539, 544 (2010) ("[T]o preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required."); *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) ("*Both* a trial objection *and* a written post-trial motion raising the issue are required for alleged errors that could have been raised during trial." (Emphases in original.)). Defendant nevertheless asks this court to review his forfeited claims as either plain error or, alternatively, as ineffective assistance of counsel.

¶ 50        Under the plain-error doctrine, this court may review unpreserved claims of error when

> "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

¶ 51    To establish first-prong plain error, the defendant must establish a prejudicial error by establishing both a plain error and that the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice against him. *People v. Stevens*, 2018 IL App (4th) 160138, ¶ 71. In determining whether the evidence at trial was close, " 'a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case.' " *Id.* (quoting *People v. Sebby*, 2017 IL 119445, ¶ 53). If the error "could not have changed the outcome of the case," and therefore could not have tipped the scales of justice against the defendant, there is no first-prong plain error. *People v. Wills*, 2017 IL App (2d) 150240, ¶ 53.

¶ 52    The first step of plain-error review is determining whether the defendant has established a clear or obvious error occurred. *Hillier*, 237 Ill. 2d at 545. The defendant bears the burden of persuasion in establishing plain error. *People v. Wilmington*, 2013 IL 112938, ¶ 43.

¶ 53    We review a claim of ineffective assistance of counsel under the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Henderson*, 2013 IL 114040, ¶ 11. "Under this test, a defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness, and a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* The failure to establish either prong precludes a finding of ineffective assistance of counsel. *Id.*

¶ 54    "When addressing a claim of plain error and an alternative claim of ineffective assistance of counsel, appellate courts first consider whether the defendant has established a clear or obvious error." *People v. Gilker*, 2023 IL App (4th) 220914, ¶ 78. Without a clear or obvious error, neither the plain-error doctrine nor a claim of ineffective assistance will relieve the defendant of the forfeiture. *Id.*

¶ 55                              A. Other-Crimes Evidence

¶ 56        Defendant argues he was denied a fair trial where the jury heard evidence he, on separate occasions, had sex with a 13-year-old girl and with Michaela when she was 14 years old. The State responds any error regarding evidence defendant had sex with a 13-year-old girl was corrected when the trial court instructed the jury to disregard it, and evidence defendant sexually assaulted Michaela when she was 14 was proper.

¶ 57                    1. *Evidence of Defendant's Assault of a 13-Year-Old Girl*

¶ 58        We begin with defendant's argument suggesting evidence he previously had sex with a 13-year-old girl deprived him of a fair trial. Specifically, defendant contends such evidence amounted to highly prejudicial hearsay about another crime for which he was not charged, which served only to suggest to the jury he "had an interest in underage girls." While defendant concedes the trial court instructed the jury to disregard the message, he asserts any ameliorative effect of the instruction was "undone" when the exhibit containing the message was provided to the jury during deliberations. He asserts this amounted to first-prong plain error. He also contends counsel's failure to preserve this issue amounted to ineffective assistance of counsel.

¶ 59        "A defendant's guilt must be based on relevant and competent evidence 'uninfluenced by bias or prejudice raised by irrelevant evidence.' " *Id.* ¶ 64 (quoting *People v. King*, 2020 Il 123926, ¶ 43, citing *People v. Bernette*, 30 Ill. 2d 359, 371 (1964)). Relevant evidence, or such evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," is admissible except as otherwise provided by law. Ill. Rs. Evid. 401, 402 (eff. Jan. 1, 2011). Even so, relevant evidence can be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading

the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Ill. R. Evid. 403 (eff. Jan. 1, 2011).

¶ 60 Pursuant to section 115-7.3(b) of the Procedure Code, when a defendant has been charged with certain sex offenses, including criminal sexual assault, evidence of the defendant's commission of certain other sex offenses may be admissible for its bearing on any matter to which it is relevant, including propensity to commit the charged sex offenses. 725 ILCS 5/115-7.3(b) (West 2024); *People v. Hunter*, 2023 IL App (4th) 210595, ¶ 56. However, such evidence must be "otherwise admissible under the rules of evidence." 725 ILCS 5/115-7.3(b) (West 2024). Accordingly, evidence that would be inadmissible under normal circumstances, such as hearsay evidence, remains inadmissible under section 115-7.3. *Hunter*, 2023 IL App (4th) 210595, ¶ 60.

¶ 61 Here, defendant claims the references to allegations he had sex with a 13-year-old girl contained in Jessica's testimony and her text message in an exhibit that was admitted into evidence were inadmissible and rendered his trial unfair. This argument is unavailing. The record establishes, when the prosecutor noted to Jessica during her testimony he wanted to "talk about" the assertion defendant "had slept with a 13 year old," defendant's counsel immediately objected. Although the trial court granted some leeway to the prosecutor to ascertain whether Jessica had personal knowledge of that act, Jessica stated she did not, and defendant's counsel immediately requested the court instruct the jury to "disregard that then." The court did just that, promptly instructing the jury, since Jessica had "no personal knowledge I ask that you disregard the statement in that text message." Thereafter, prior to the jury's deliberations, the court instructed the jury to disregard any testimony and exhibits it refused. "[T]he error of admitting evidence of other crimes for which defendant is not on trial can be cured when the improper testimony is promptly stricken and the trial court instructs the jury to disregard it." (Internal quotation marks

omitted.) *People v. Abdullah*, 336 Ill. App. 3d 940, 950 (2002) (quoting *People v. Biggs*, 294 Ill. App. 3d 1046, 1051 (1998)). Accordingly, we conclude the trial court cured any potential error by instructing the jury to disregard references to defendant's sexual activity with a 13-year-old girl.

¶ 62　　　　Defendant responds, however, the trial court's instruction was insufficient to ensure the jury disregarded Jessica's testimony because her testimony was "so inflammatory" it was unlikely the instruction "made any difference" and, in any event, any ameliorative effect of the instruction was "undone" when the exhibit containing Jessica's text message referring to defendant's alleged conduct with a 13-year-old girl was provided to the jury during its deliberations. We reject this argument because we presume a jury will follow the court's instructions. *People v. Lewis*, 2019 IL App (4th) 150637, ¶ 83. As the court instructed the jury to disregard "the statement in that text message," we presume the jury did not consider the references to defendant's alleged sexual conduct with a 13-year-old girl, including after an exhibit containing text messages referencing the same was provided to the jury during its deliberations.

¶ 63　　　　Because we conclude the trial court's instruction to the jury to disregard evidence of defendant's alleged sexual conduct with a 13-year-old girl resolves this issue, we do not address the additional argument defendant raised in support of this point, namely, that the State should have filed a pretrial motion seeking to admit the contested evidence under section 115-7.3 of the Procedure Code. As we find no error, we find no plain error, and defendant cannot show his counsel provided ineffective assistance.

¶ 64　　　　　　　　　2. *Michaela's Testimony Defendant Had Sex With Her*
*When She Was 14*

¶ 65　　　　We next consider defendant's argument it was plain error for the trial court to allow the introduction of Michaela's "brief testimony" he had sex with her when she was 14 because such testimony deprived him of a fair trial. Specifically, he asserts, contrary to the court's

- 21 -

determination, his motion *in limine* to bar Michaela's testimony he had assaulted her prior to the events in this case was not rendered moot by the court's disposition of the State's motion *in limine* pursuant to the rape shield statute. Thus, he claims, for Michaela's testimony about this alleged prior assault to be presented, the court was first required to weigh the probative value of the evidence against undue prejudice to him, which the court failed to do. He further contends the court failed to give Illinois Pattern Jury Instructions, Criminal, No. 3.14 (approved Oct. 17, 2014) (hereinafter IPI Criminal No. 3.14), which would have limited the jury's consideration of such other-crimes evidence. Finally, defendant argues his counsel's failure to preserve these issues amounted to ineffective assistance. These arguments are unavailing.

¶ 66     Notably, defendant does not contest Michaela's testimony is of the type that might be permissible under section 115-7.3 of the Procedure Code. Instead, he argues the trial court erred in allowing her testimony to be presented without first weighing its probative value against undue prejudice to him, particularly where his motion *in limine* to bar her testimony about prior alleged assaults by defendant was not rendered moot. However, even assuming defendant's motion *in limine* was not rendered moot, defendant did not object or otherwise contest the introduction of Michaela's testimony. Nor does defendant present any authority for the proposition the court was required to interject itself upon the State's elicitation of Michaela's testimony to assess its admissibility.

¶ 67     Beyond that, we emphasize the only evidence defendant contests on appeal pertaining to his alleged prior assault of Michaela while she was under 18 was "Michaela's testimony that [defendant] sexually assaulted her when she was 14." However, Michaela's testimony was not the only evidence presented tending to establish defendant had engaged in sexual activity with Michaela while she was under 18. Critically, State group exhibit No. 3

contained several text messages from Jessica referring to the assault when Michaela was 14. For example, Jessica texted defendant, "You were f*** my 14 yr old you didn't need me." Moreover, Jessica referred to defendant having sex with Michaela "18months [*sic*]" prior to November 2024, at which time she would have been under 18. Additionally, on the July 2023 phone call between Jessica and defendant, which was recorded by Rodriguez, defendant admitted Michaela had her "hands in my pants" when she was 14. Beyond that, defendant's own sexually explicit text messages with Michaela were admitted, and evidence was adduced the latest those messages were sent was August 2022, when Michaela was under 18. Therein, defendant texted Michaela, "sorry u have a great p***" and attempted to convince her they "ain't gotta f*** all the time just some times [*sic*]." Defendant objected to none of this evidence at trial, and he does not contest any of it on appeal. Thus, even assuming Michaela's testimony was improperly admitted, we cannot say it was dispositive, as it was merely cumulative of evidence presented by other witnesses and exhibits defendant did not contest. See *People v. Davidson*, 160 Ill. App. 3d 99, 119 (1987) (concluding no plain error occurred where the evidence introduced at trial defendant complained of on appeal "was cumulative of other evidence properly admitted"); *People v. Whitley*, 2023 IL App (4th) 200082-U, ¶¶ 73-74 (same).

¶ 68      Finally, to the extent defendant argues IPI Criminal No. 3.14 should have been given to the jury, we reject that argument. As provided by IPI Criminal No. 3.14, when evidence is received that a defendant was involved in an offense other than those charged on such issues as, *inter alia*, intent, motive, design, or knowledge, the evidence may be considered "only for that limited purpose." Despite defendant's motion *in limine* to bar Michaela's testimony about her assault by defendant when she was 14, the State responded such testimony was admissible pursuant to section 115-7.3. As previously noted, section 115-7.3 provides, when a defendant is charged

with certain sex offenses, including criminal sexual assault, evidence of other sex offenses is admissible for its bearing on any matter to which it is relevant, including propensity to commit the charged sex offenses. Although defendant now claims the trial court failed to rule on his motion *in limine*, Michaela's testimony was admitted without objection. And to the extent Michaela's other-crimes evidence was admitted for purposes of propensity under section 115-7.3, an IPI Criminal No. 3.14 instruction would not be required. See *People v. Perez*, 2012 IL App (2d) 100865, ¶ 59 (concluding there was no error in the court's failure to provide limiting instruction where, "under section 115-7.3, the evidence was admissible without limitation"); see also *People v. Jones*, 2023 IL App (1st) 220126-U, ¶ 59 (noting, where other-crimes evidence was admitted for propensity purposes under section 115-7.3, giving an IPI Criminal No. 3.14 instruction would be of "limited or no value" because it "would have limited essentially nothing"). Thus, defendant cannot establish any error occurred relating to the failure to give an IPI Criminal No. 3.14 instruction to the jury.

¶ 69     In sum, we conclude defendant has failed to establish a clear or obvious error relating to the admission of evidence that he had sex with a 13-year-old girl and with Michaela when she was 14. Absent error, there can be no plain error, and we will not find defendant's trial counsel provided ineffective assistance.

¶ 70                    B. Prosecutorial Misconduct

¶ 71     Defendant next argues plain error occurred in that the prosecutor engaged in several instances of misconduct, which rendered his trial unfair. Specifically, he asserts the prosecutor (1) ambushed defendant by eliciting inadmissible other-crimes testimony without first addressing the issue in a pretrial motion *in limine*, (2) violated the advocate-witness rule while questioning witnesses and during closing argument, (3) questioned defendant about his postarrest silence,

(4) failed to tender a jury instruction limiting the jury's consideration of other-crimes testimony, and (5) made improper comments during closing argument. Defendant further asserts, without identifying any specific conduct or providing any explanation or analysis, that "counsel was ineffective." The State responds none of the actions defendant complains of rendered his trial unfair.

¶ 72                    1. *The State's Introduction of Other-Crimes Testimony*

¶ 73          Defendant first complains of the prosecutor's elicitation of Jessica's testimony defendant had sex with a 13-year-old girl. He argues his trial counsel's objection to the testimony revealed "counsel was not apprised ahead of time that such evidence would be presented," and the State should have filed a motion *in limine* requesting the admission of such evidence. We reject this argument for the reasons discussed above, namely, upon the elicitation of Jessica's testimony, defendant's trial counsel promptly objected and, after the trial court sustained the objection, requested the court instruct the jury to disregard evidence of defendant's prior sexual activity with a 13-year-old girl. Because the trial court so instructed the jury, and we presume the jury will follow the court's instructions, defendant cannot establish any error occurred relating to the evidence of which he complains or the prosecutor's conduct in relation to it. See *Lewis*, 2019 IL App (4th) 150637, ¶ 83. Without error, there can be no plain error, and defendant cannot show his counsel provided ineffective assistance.

¶ 74                    2. *The Advocate-Witness Rule*

¶ 75          Defendant also argues the prosecutor violated the advocate-witness rule while questioning Jessica, Russell Sr., and Russell Jr. by presenting his own testimony under the guise of asking questions and making improper references to his "testimony" during his closing argument. The State responds the advocate-witness rule is inapplicable because the prosecutor was

not offering testimony but pursuing questioning that appropriately called into question the witnesses' credibility.

¶ 76　　　　The advocate-witness rule "bars attorneys from assuming a dual role as advocate and witness in the same proceedings." *People v. Blue*, 189 Ill. 2d 99, 136 (2000). In *Blue*, which defendant relies upon, two prosecutors interviewed a witness after a warrant had been issued for her arrest, and those prosecutors later tried the case against the defendant. *Id.* at 134. During the examination of that witness, the prosecutors repeatedly used improper " 'objections' " that went beyond stating the evidentiary bases therefor. *Id.* at 135-37. For example, after the witness gave testimony the prosecutors disagreed with, one prosecutor interjected stating, " '[O]bjection. That's a lie.' " *Id.* at 135. Additionally, when the witness testified one of the prosecutors had an " 'attitude' " during their interview and made a comment she took offense to, the prosecutor stated, " 'I didn't.' " *Id.* Moreover, after one of the prosecutors asked the witness if she had any other issues about the interview, the witness responded, " 'I'm just saying I didn't like the attitude. Who wanted to get locked up?' " *Id.* at 136. The prosecutor responded, " 'You being locked up wasn't our decision. There was a warrant out for you.' " *Id.* Our supreme court concluded the prosecutors' "objections" violated the advocate-witness rule because in making them, the prosecutors were simply interjecting their own testimony about the contents of the interview to rebut the witness's account of what happened. *Id.* at 134-37.

¶ 77　　　　Here, defendant challenges several interactions between the prosecutor and witnesses. He contests the following exchange the prosecutor had with Jessica after she claimed Michaela recanted her allegations defendant had assaulted her:

"Q. You didn't go to the police and say hey these things didn't happen?

A. No.

Q. You didn't go to—you didn't come to me and my office?

A. No.

Q. Knowing that your husband was on trial and tell me these things didn't happen?

A. No.

Q. In fact the first time you spoke with me about this was July 8 just last week, is that correct?

A. I believe so, yes.

Q. And when we talked I asked you if you believed that your daughter and the Defendant were having sex in 2022 and you told me yes, isn't that correct?

A. I don't remember."

Defendant also challenges the prosecutor's comments during closing argument referring to this exchange, in which the prosecutor noted, "I just talked to her on July 8th, 2024, not even 10 days ago, and she couldn't recall what we talked about." Defendant also challenges the prosecutor's asking Russell Sr. and Russell Jr. whether it was correct they never told him their "side of the story."

¶ 78       We reject defendant's argument that the foregoing exchanges violated the advocate-witness rule. Here, unlike in *Blue*, the prosecutor's questioning and comments during closing argument did not serve to inject his own testimony or describe his account of an event for the purpose of rebutting the witnesses' version of that event. Instead, they amounted to inquiry into and consideration of the witnesses' credibility in that the prosecutor's questioning and argument tended to show Jessica, Russell Jr., and Russell Sr. fabricated the exculpatory evidence regarding defendant. The credibility of these witnesses was a proper subject of both cross-

examination and closing argument. See *People v. Stevens*, 2014 IL 116300, ¶ 16 ("Additionally, [a]ny permissible matter which affects the witness's credibility may be developed on cross-examination." (Internal quotation marks omitted.); *People v. Pingelton*, 2021 IL App (4th) 180751, ¶ 57 ("In fact, closing argument is precisely the proper time for counsel to argue to the jury why certain witnesses or evidence should be believed or not."). Accordingly, we cannot find the prosecutor violated the advocate-witness rule by eliciting testimony from Jessica, Russell Sr., and Russell Jr. relating to their failure to inform him of exculpatory evidence regarding defendant or by referring to that testimony during closing argument. Because we find no error, there can be no plain error, and defendant cannot establish his counsel was ineffective.

¶ 79                                    3. *Postarrest Silence*

¶ 80          Defendant argues the prosecutor improperly inquired about his postarrest silence during cross-examination by asking him whether he previously offered his explanation of events to any law enforcement personnel. In response, the State concedes the prosecutor's questioning was improper, but any error was cured or otherwise harmless.

¶ 81          In *Doyle v. Ohio*, 426 U.S. 610, 619 (1976), the United States Supreme Court determined the prosecution generally cannot use a defendant's post-*Miranda*-warning (see *Miranda v. Arizona*, 384 U.S. 436 (1966)) silence or request for an attorney for impeachment purposes without violating due process. *People v. Dameron*, 196 Ill. 2d 156, 163 (2001). The Court reasoned, "[I]t would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Doyle*, 426 U.S. at 618. Even so, a violation of this general prohibition can constitute harmless error. *Dameron*, 196 Ill. 2d at 164. Our supreme court has recognized five factors to consider in determining whether a *Doyle* violation was harmless beyond a reasonable doubt:

"(1) the party who elicited the testimony about the defendant's silence; (2) the intensity and frequency of the references to the defendant's silence; (3) the use that the prosecution made of the defendant's silence; (4) the trial court's opportunity to grant a mistrial motion or to give a curative jury instruction; and (5) the quantum of other evidence proving the defendant's guilt." *Id.*

¶ 82     Here, defendant complains of the prosecutor's asking whether he spoke with law enforcement officers or anyone else "prior to today," leading defendant's counsel to object. Although the record does not detail what transpired at the resulting sidebar or whether the trial court sustained the objection, the prosecutor subsequently asked a different question of defendant, inquiring whether he raised his comprehension issues and his claim Michaela initiated sex with him after she turned 18 "to anybody previously." Defendant answered that only Rodriguez attempted to speak with him and he asked Rodriguez for an attorney but would have spoken to him after receiving one.

¶ 83     Upon our consideration of the above factors, we hold any *Doyle* violation was harmless beyond a reasonable doubt. While it is true the State's questioning elicited testimony from defendant pertaining to his decisions to refrain from speaking and request an attorney, this brief and isolated exchange was the only reference to that subject, and no mention of defendant's silence or request for an attorney was made during closing arguments. See *People v. Hart*, 214 Ill. 2d 490, 518, 520 (2005) (concluding a *Doyle* violation was harmless where any potentially improper reference "was brief and isolated, and the prosecutor never revisited *that* aspect of testimony" (emphasis in original)); *People v. Lucas*, 132 Ill. 2d 399, 433 (1989) (concluding any *Doyle* violation was harmless where "the prosecutor made no further reference to the defendant's request for an attorney and it was not argued as evidence"). Additionally, the record shows, when

the prosecutor first broached the subject of defendant's silence, defendant's counsel immediately objected, though the record does not indicate whether the trial court sustained the objection or whether counsel asked for a curative instruction. Even so, following the sidebar, the prosecutor revised his question to ask defendant about his claims in such a way as to not implicate his conversations with law enforcement officers, and defendant's counsel sought no curative instruction. Defendant makes no effort to disabuse us that (1) the court barred any reference to defendant's discussions with officers or (2) counsel strategically requested no instruction be given so as not to highlight any improper questioning or testimony. See *Dameron*, 196 Ill. 2d at 165-66 (noting a *Doyle* violation was harmless because improper reference was so brief and isolated counsel refused a curative instruction to avoid highlighting it, the court barred further improper references, and the State never returned to the testimony during the trial). Finally, the State presented strong evidence of defendant's guilt, including Michaela's testimony, a phone call recording from July 2023 in which defendant admitted to having sex with Michaela "last summer" and acknowledged times when Michaela had her "hands in my pants" while she was 14, and screenshots of sexually explicit text messages between defendant and Michaela with metadata establishing the latest they were created was August 9, 2022. Accordingly, we conclude any *Doyle* violation here was harmless beyond a reasonable doubt, and in the absence of any harm, any ineffective assistance claim defendant sought to raise with respect to this issue is meritless because defendant cannot demonstrate prejudice. See *People v. Johnson*, 154 Ill. 2d 227, 236-37 (1993) (concluding where "any resulting error would have been deemed harmless beyond a reasonable doubt," the defendant could not raise a meritorious claim of ineffective assistance of counsel).

¶ 84            4. *Failure to Tender a Limiting Instruction Regarding*
                        *Other-Crimes Evidence*

¶ 85            Defendant argues, because the State elicited Michaela's testimony defendant

sexually assaulted her when she was 14, the prosecutor was obligated to tender IPI Criminal No. 3.14 to limit the jury's consideration of that other-crimes testimony but failed to do so, resulting in an unfair trial. As we have already explained, however, Michaela's testimony was admissible under section 115-7.3 of the Procedure Code for its bearing on any matter to which it is relevant, including defendant's propensity to commit the charged sex offenses. Thus, because Michaela's testimony was admissible without limitation, there was no error in the failure to request or give IPI Criminal No. 3.14. See *Perez*, 2012 IL App (2d) 100865, ¶ 59. Absent any error, defendant can show neither plain error nor ineffective assistance of counsel.

¶ 86                                    5. *Closing Argument*

¶ 87           Finally, defendant argues the prosecutor engaged in misconduct during closing argument by referring to Jessica and Russell Sr. as individuals who would "say anything" to prevent defendant from getting in trouble and contrasting them with Michaela, whom he claimed answered questions "truthfully and competently because she told you what happened." Defendant contends these comments amounted to improper vouching for Michaela's credibility. Defendant also argues the prosecutor constructively amended the obstructing justice charge by claiming defendant told Jessica and Michaela to delete text messages from their cell phones, despite the obstruction charge alleging in the charging instrument defendant took Michaela's cell phone to conceal evidence of sexual abuse. The State responds these arguments are meritless because the prosecutor's comparison of the witnesses' testimonies was a proper commentary on their credibility and defendant was not prejudiced by any amendment to the charging instrument.

¶ 88           We first address defendant's argument the prosecutor improperly vouched for Michaela's credibility. The State has wide latitude to make a closing argument, and it may comment on the evidence and any reasonable inferences therefrom, even if they reflect negatively

on the defendant. *Gilker*, 2023 IL App (4th) 220914, ¶ 125. "Comments during closing argument should be considered in the context of the argument as a whole." *Id.* While the State may argue a witness is or is not credible, it cannot personally vouch for a witness's credibility or use the credibility of the state's attorney's office to bolter a witness's testimony. *Id.* ¶ 126. Reversal is warranted where an improper comment caused substantial prejudice, such that a reviewing court cannot determine whether the verdict resulted from the comment. *Id.* Thus, a "prosecutor's comment in closing argument is reversible error only if it is both (1) improper and (2) substantially prejudicial." *Id.* For a comment to be improper, a prosecutor must explicitly state his or her personal views about the credibility of a witness; a comment is not improper if the jury must infer the prosecutor is asserting his or her personal views regarding a witness's credibility. *Id.* ¶ 130.

¶ 89          We conclude the prosecutor did not improperly vouch for Michaela's credibility. When read as a whole, the comments defendant complains of were appropriate arguments about witness credibility. On several occasions during his argument, the prosecutor conveyed it was the jury's responsibility to assess the credibility of the witnesses and asserted the jury should find Michaela more credible than Jessican and Russell Sr. because she gave more straightforward answers than them about what occurred. The record shows the prosecutor at no point crossed the line into vouching for Michaela's credibility by making an explicit statement as to his personal views. Accordingly, we determine the prosecutor's comments were proper arguments on witness credibility, not an attempt to personally vouch for Michaela's credibility. See *People v. Taylor*, 2018 IL App (4th) 140060-B, ¶¶ 35-36 (concluding the prosecutor's argument about the credibility of witnesses was not improper where he did not state it was his personal view).

¶ 90          We now turn to defendant's argument the prosecutor improperly constructively amended the obstructing justice charge by arguing defendant committed the offense by texting

Jessica and Michaela to delete messages from their phone. Defendant contends this amounted to a fatal variance between the charging instrument and the evidence presented, as the information asserted defendant committed the offense by taking Michaela's cell phone.

¶ 91    " 'The State must prove the essential elements of the charging instrument as alleged and without variance.' " *People v. Arrendondo*, 2023 IL App (2d) 220084, ¶ 29 (quoting *People v. Miller*, 253, Ill. App. 3d 1032, 1035 (1993)). Reversal of a defendant's conviction is required where a fatal variance exists between the charging instrument and the proof pursuant to which the defendant was convicted at trial. *Id.* For a variance to be fatal, the difference between a charging instrument and the proof at trial must be "material and be of such character as may mislead the defendant in making his or her defense, or expose the defendant to double jeopardy." (Internal quotation marks omitted.) *Id.* (quoting *People v. Lattimore*, 2011 IL App (1st) 093238, ¶ 67, quoting *People v. Maggette*, 195 Ill. 2d 336, 351 (2001)). " 'If the essential elements of an offense are properly charged but the *manner* in which the offense is committed is incorrectly alleged, the error is one of form' and will not create a fatal variance." (Emphasis in original.) *Id.* (quoting *Lattimore*, 2011 IL App (1st) 093238, ¶ 67).

¶ 92    As is relevant here, a person commits the offense of obstructing justice "when, with intent to prevent the apprehension or obstruct the prosecution or defense of any person, he or she knowingly *** [d]estroys, alters, conceals or disguises physical evidence." 720 ILCS 5/31-4(a)(1) (West 2022). In this case, the information cited section 31-4(a)(1) of the Criminal Code of 2012 and charged defendant with obstructing justice, alleging he, "with the intent to prevent his prosecution, knowingly concealed physical evidence of sexual abuse in that the defendant took the cell phone of the victim." Defendant asserts, by arguing during closing argument defendant committed obstructing justice "when he took the phone and texted *** messages [to Michaela and

Jessica] regarding deleting things," the prosecutor erred by "trying to convince the jury to convict [defendant] based on a different theory than the one alleged" in the information. We are unpersuaded.

¶ 93　　　　Initially, when read in context, we do not interpret the prosecutor's comments to be an attempt to allege a theory different than the one alleged in the information. The prosecutor's references to messages to others instructing them to delete conversations were made to establish why defendant took Michaela's phone in the first instance. The prosecutor argued defendant, at the time he took Michaela's phone, aimed "to delete damning information" from it, which evidenced an "intent to obstruct prosecution," such that he "knowingly did this when he took the phone." Accordingly, we ascertain no variance—and thus no error—between the information and the argument asserted by the State during closing argument. See *Arrendondo*, 2023 IL App (2d) 220084, ¶¶ 25, 32-33 (rejecting the defendant's argument a variance existed when the charging instrument alleged a theory of aggravated fleeing and eluding based upon the failure to stop her vehicle but she was proved guilty based upon a different, uncharged theory of driving away).

¶ 94　　　　However, even if there were a variance by interpreting the State's argument as asserting a new, uncharged theory that defendant obstructed justice by instructing others to delete text messages from their phones, such a variance was not fatal. Defendant makes no effort to explain how he was prejudiced or misled in making his defense. Indeed, defendant acknowledges in his brief evidence was presented Michaela's phone was returned to her a few days later and no information was deleted from it. Moreover, defendant himself testified he did *not* seek to delete anything from the phone. Had the information further delineated the factual progression of defendant's actions to include that he instructed Jessica and Michaela to delete text conversations, we do not see how defendant's defense would have been any different. See *id.* ¶ 34 (concluding

any potential variance was not fatal where, "had the indictment specifically delineated the factual progression of defendant's actions," there was no indication of how defendant's defense "would have been any different"). Additionally, the record shows the trial court instructed the jury closing arguments were not evidence and to disregard any statement or argument made by the attorneys not based on the evidence.

¶ 95    Given the foregoing, we discern no error, and absent error, defendant can establish neither plain error nor ineffective assistance of counsel.

¶ 96                    C. Ineffective Assistance of Counsel

¶ 97    Defendant argues his trial counsel provided ineffective assistance stemming from several failures. Specifically, he contends counsel was ineffective by (1) acquiescing in the trial court's denial of his motion *in limine* to bar evidence of Michaela's accusation he sexually assaulted her prior to the instant case; (2) eliciting defendant's testimony about a 2011 burglary conviction; (3) failing to tender IPI Criminal No. 3.14 to limit the jury's consideration of evidence of Michaela's prior sexual assault allegation; (4) failing to request the redaction of a reference to defendant's having sex with a 13-year-old girl from a text message exhibit provided to the jury during its deliberations; (5) failing to object to the prosecutor's violation of the advocate-witness rule, vouching for Michaela's credibility, and constructively amending the obstructing justice charge; (6) failing to object to the prosecutor's asking about defendant's postarrest silence; and (7) failing to preserve these issues by raising them in a posttrial motion.

¶ 98    As we previously explained, to establish a claim of ineffective assistance of counsel, a defendant must show both that his counsel's performance fell below an objective standard of reasonableness and that a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Henderson*, 2013 IL

114040, ¶ 11. If the defendant fails to make a showing of either deficient performance or prejudice, there can be no finding of ineffective assistance. *Id.*

¶ 99 At this juncture, we need only address defendant's argument counsel was ineffective for eliciting his testimony he had a 2011 burglary conviction, as we have already determined none of his remaining complaints involved error, and therefore, cannot support a claim of ineffective assistance of counsel. *Gilker*, 2023 IL App (4th) 220914, ¶ 78.

¶ 100 Defendant argues counsel provided ineffective assistance by eliciting his testimony he had a felony conviction for burglary from 2011, as counsel had no strategic reason for eliciting such testimony. We disagree.

¶ 101 In the first instance, our review of the record does not establish counsel expressly elicited testimony from defendant regarding his 2011 burglary conviction. To be sure, counsel asked defendant if he was a convicted felon, and when defendant responded in the affirmative, counsel asked, "And that relates to what?" However, we cannot say this questioning fell below an objective standard of reasonableness. While the trial court determined prior to trial defendant's 2011 felony conviction for burglary would not be admissible, it *did* allow the introduction of defendant's 2022 felony theft conviction. Defendant makes no effort to disabuse us of the likely possibility the felony counsel sought to elicit from defendant was his 2022 theft conviction, but that defendant instead volunteered his 2011 felony burglary conviction.

¶ 102 Further, even assuming, *arguendo*, counsel should have anticipated defendant might inadvertently testify as to his 2011 burglary conviction, defendant has not established, absent such testimony, the result of the proceeding would have been different, particularly in light of, *inter alia*, Michaela's testimony of defendant's sexual abuse, corroborating text messages between defendant and Michaela and defendant and Jessica, and a corroborating phone recording between

defendant and Jessica. Thus, defendant also cannot establish he suffered prejudice resulting from testimony about his 2011 burglary conviction.

¶ 103    Accordingly, because defendant cannot establish either that his counsel was deficient or that he suffered prejudice as a result of the elicitation of his 2011 burglary conviction, this claim of ineffective assistance, like his additional ineffective assistance arguments, is without merit.

¶ 104                          D. Sentencing

¶ 105    Finally, defendant argues he was denied a fair sentencing hearing where, in imposing its sentence for criminal sexual assault, the trial court considered the harm caused to Michaela to be an aggravating factor, despite the absence of evidence to show any harm greater than what was inherent in the offense. Defendant contends this resulted in the court committing second-prong plain error by imposing an improper double enhancement. He also argues his counsel was ineffective for failing to preserve this issue. The State responds the court's consideration of harm was proper.

¶ 106    "Whether a trial court considered an improper factor when sentencing a defendant is a question of law, which we review *de novo*." *People v. Winchester*, 2016 IL App (4th) 140781, ¶ 72. "There is a strong presumption that the trial court based its sentencing determination on proper legal reasoning, and a court of review should consider the record as a whole, rather than focusing on a few words or statements by the trial court." *People v. Canizalez-Cardena*, 2012 IL App (4th) 110720, ¶ 22. The burden is on the defendant to affirmatively establish the court relied on an improper sentencing factor when imposing a sentence. *People v. Williams*, 2018 IL App (4th) 150759, ¶ 18.

¶ 107    A factor inherent in the offense should not be considered a factor in aggravation at

sentencing. *People v. Dowding*, 388 Ill. App. 3d 936, 942 (2009). This is due to the presumption the legislature weighs the factors inherent in offenses when it sets sentencing ranges. *People v. Conover*, 84 Ill. 2d 400, 404-05 (1981). Even so, it is appropriate for the trial court to consider the seriousness, nature, and circumstances of the crime, including the nature and extent of the elements of the offense. *People v. Saldivar*, 113 Ill. 2d 256, 271-72 (1986); see *People v. Shaw-Sodaro*, 2023 IL App (4th) 220704, ¶ 70 (concluding the trial court was free to consider the victim's age for purposes of imposing a sentence *within* the range for the offense of aggravated criminal sexual abuse).

¶ 108    Initially, we note defendant invokes only second-prong plain error, noting, in *People v. Martin*, 119 Ill. 2d 453 (1988), our supreme court "found an improper double enhancement *** to be second-prong plain error." Defendant's reading of *Martin* is mistaken. Our supreme court has since clarified *Martin* did "not implicate the second prong of the plain error rule." *People v. Johnson*, 2024 IL 130191, ¶ 79. Indeed, the court has held a "sentencing court's error of considering [an] inapplicable aggravating factor is amenable to harmless error analysis, [such that] it is not a structural error and may not be reviewed under the second prong of the plain error rule." *Id.* ¶ 92. Accordingly, we reject defendant's invitation to review this issue as second-prong plain error.

¶ 109    In any event, we conclude defendant has failed to establish any error occurred in the first instance. Defendant takes issue with the trial court's consideration that his actions "caused great harm" to Michaela. While he acknowledges that "the defendant's conduct caused or threatened serious harm" is a factor in aggravation that may be considered by the court in rendering a sentence (see 730 ILCS 5/5-5-3.2(a)(1) (West 2022)), he contends there was "no evidence presented, at trial or at sentencing," "detailing the impact [defendant]'s conduct had on her" that

was "greater than [the harm] the legislature assumes is inherent" in the offense of criminal sexual assault. This argument is unavailing.

¶ 110   As is relevant here, defendant was charged with criminal sexual assault, the elements of which are as follows: "A person commits criminal sexual assault if that person commits an act of sexual penetration and *** is a family member of the victim, and the victim is under 18 years of age." 720 ILCS 5/11-1.20(a)(3) (West 2022). Harm is not an element of or inherent to the offense. See *People v. Kerwin*, 241 Ill. App. 3d 632, 636 (1993). Accordingly, it was appropriate for the trial court to consider that defendant's conduct caused or threatened serious harm.

¶ 111   To that end, the record contained evidence defendant's conduct caused serious harm to Michaela. See *People v. Reber*, 2019 IL App (5th) 150439, ¶ 94 ("Psychological trauma to a victim may be considered as an aggravating factor without direct evidence of trauma."). Screenshots from 2022 of text messages between defendant and Michaela showed, after the "first time" defendant had sex with Michaela—while she was younger than 18—she was "stressing" because defendant only wanted sex, despite her continued insistence she did not want to have sex with him. They also revealed defendant accused Michaela of having manufactured a plan to use him for sex so he would pay for her school expenses, and he repeatedly threatened to withhold any additional school assistance unless she had sex with him. That sentiment was corroborated by Michaela's testimony. Michaela claimed this "upset" her because she was not "us[ing]" defendant for sex and did not want to have sex with him. Additionally, Michaela testified defendant had tried on several occasion to "keep [her] quiet" about their sexual interactions and at one point would not allow her to live at Jessica's residence unless she wrote a letter in which she denied having sex with him. From this evidence, the trial court could properly conclude defendant's actions caused

serious harm to Michaela, warranting its application as an aggravating factor when sentencing defendant.

¶ 112    Accordingly, we conclude no error occurred with respect to the trial court's sentencing of defendant. Absent error, there can be no plain error, and defendant cannot show his counsel rendered ineffective assistance.

¶ 113                              III. CONCLUSION

¶ 114    For the reasons stated, we affirm the trial court's judgment.

¶ 115    Affirmed.